UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SHERI WEST, on behalf of herself and all others similarly situated,<br><br>*Plaintiff*<br><br>vs.<br><br>WILCO LIFE INSURANCE COMPANY,<br><br>*Defendant* | CAUSE NO. 1:20-cv-2961 RLM-DLP |

ORDER

Sheri West filed a putative class action against Wilco Life Insurance Company alleging breach of contract and seeking declaratory relief. Wilco Life Insurance Company moves to dismiss under Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, the court denies Wilco Life Insurance Company's motion to dismiss.

I. STANDARD OF REVIEW

A court considering a Rule 12(b)(6) motion to dismiss construes the complaint in the light most favorable to the nonmoving party, accepts all well-pleaded facts as true, and draws all inferences in the nonmoving party's favor. Reynolds v. CB Sports Bar, Inc., 623 F.3d 1143, 1146 (7th Cir. 2010). But Fed. R. Civ. P. 8(a)(2) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. at 678 (quoting Bell Atlantic v. Twombly, 550 U.S. at 570). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Bell Atlantic v. Twombly, 550 U.S. at 556). Twombly and Iqbal "require the plaintiff to 'provid[e] some specific facts' to support the legal claims asserted in the complaint." McCauley v. City of Chi., 671 F.3d 611, 616 (7th Cir. 2011) (quoting Brooks v. Ross, 578 F.3d 574, 581 (7th Cir. 2009)). The plaintiff "must give enough details about the subject-matter of the case to present a story that holds together." Swanson v. Citibank, N.A., 614 F.3d 400, 404 (7th Cir. 2010).

## II. STATEMENT OF FACTS

Sheri West purchased a universal life insurance policy from American Life and Casualty Insurance Company on April 1, 1994. On August 1, 2001, Ms. West exchanged her policy for a policy with Conseco Life Insurance Company. Wilton Re acquired Conseco Life Insurance Company in 2014 and changed Conseco Life Insurance Company's name to Wilco Life Insurance Company.

A universal life insurance plan allows a policyholder to accumulate savings while alive by paying flexible premiums. When a policyholder pays a premium, that premium is added to the policyholder's accumulation value. Each month, the accumulation value accrues interest and each month the insurance company deducts costs from the accumulation value. As long as the accumulation value

is greater than the next month's costs, the policy remains in force. If the accumulation value is depleted by monthly costs, the policy lapses and the policyholder loses coverage. If the policy is still in force upon the policyholder's death, the policyholder's beneficiaries receive a death benefit. If the insurance company increases the monthly cost of insurance rates, either the accumulation value depletes at an earlier date or the policyholder must pay higher premiums to maintain the accumulation value.

Ms. West's monthly deductions are governed by a few provisions in the Conseco Life Insurance Company CIUL2 Flexible Premium Adjustable Life Insurance Policy. First, the Policy Data Page shows a table of guaranteed, maximum monthly rates. Beneath the table, the policy says "actual monthly cost of insurance rates will be determined by the company based on the policy cost factors described in your policy. However, the actual cost of insurance rates will not be greater than those shown above."

The policy also has a "Cost of Insurance" provision. That provision has an equation used to determine the "monthly cost of insurance." One of the factors included in the equation is the "Monthly cost of insurance rate as described in the Cost of Insurance Rates section." The Cost of Insurance Rates section says:

> The guaranteed monthly cost of insurance rates for the policy are based on the insured's sex, attained age, and premium cost on the date of issue. . . . These rates are shown on a Policy Date Page. Current monthly cost of insurance rates will be determined by the Company. The current monthly cost of insurance rates will not be greater than the guaranteed monthly cost of insurance rates which are listed on the Policy Date Page.

Ms. West paid a premium of $27.79 when she exchanged policies in 2001. Her premiums remained mostly the same through 2011 when she paid a monthly premium of $27.62. Then in July 2011, Wilco sent a letter to Ms. West informing her that they were increasing the cost of insurance rates for her policy because they had "incurred greater costs on these policies than we anticipated." Ms. West's cost of insurance rate increased from $27.62 per month to $40.29 per month in 2012. When the monthly rate was $27.62 per month, Ms. West's policy was projected to remain in force until 2026–2028. Once the cost of insurance rate increased to $40.29 per month, the policy was projected to terminate by May 2018, about a decade sooner than expected. By May 2018, Ms. West's cost of insurance rate exceeded $50 per month and her policy lapsed. She received no benefits from the policy.

Ms. West alleges the following as an explanation for Wilco's behavior. When Wilco was still called Conseco Life Insurance Company, it was administered by CNO Financial Group. For several years, CNO Financial Group essentially drained Conseco Life Insurance of its assets for the benefit of CNO Financial Group and its subsidiaries. CNO Financial Group forced Conseco Life Insurance to pay large dividends and fees to CNO Financial Group and its subsidiaries to boost those companies' bottom lines while depleting Conseco Life Insurance of its assets. Between 1999 and 2012, Conseco Life Insurance paid fees and dividends to these other companies double or triple the industry average of "intra-family" company payments. This left Wilco in a poor financial state.

Around that same time, Conseco Life Insurance raised its cost of insurance rates on a different set of insurance policies, resulting in litigation. Conseco Life Insurance also used what's known as a "shock lapse strategy" to improve its bottom line. The purpose of the shock lapse strategy is to dramatically raise premiums so that policyholders are forced to surrender their policies or let them lapse, which allows the insurance company to save lots of money in death benefits that it might otherwise have to pay. CNO Financial Group estimated it could save $33 million to $50 million by using a shock lapse strategy with certain policies and in 2008, Conseco Life engaged in the strategy, resulting in 4,000 policyholders surrendering coverage or allowing coverage to lapse. This shock lapse strategy also resulted in litigation. All told, Conseco Life Insurance/Wilco paid tens of millions of dollars to settle litigation and regulatory actions.

To make matters worse for Wilco, interest rates fell to historic lows and remained low in the wake of the 2008 Great Recession. This made universal life insurance policies much less profitable for insurance companies.

In the wake of CNO Financial Group's decisions to squeeze Conseco Life Insurance of its assets, Conseco Life Insurance/Wilco's huge settlement costs, and the low interest rates between 2008 and 2011, Wilco decided to raise cost of insurance rates to make up for lost revenue and increase profitability. Ms. West alleges that this was part of a shock lapse strategy, by which Wilco intended to cause its policyholders to lose coverage contrary to its assurances that policyholders would be entitled to benefits so long as they paid reasonable, risk-based rates. Ms. West brought this action on behalf of herself and those similarly

situated for breach of contract, including breach of the implied duty of good faith and fair dealing. Wilco moved to dismiss.

III. Discussion

A. *Choice of Law*

The life insurance policy in question doesn't include a choice of law provision, though the parties seem to agree that the laws of Florida should apply to this dispute. A court sitting in diversity ordinarily applies the choice of law rules of the forum state. NewSpin Sports, LLC v. Arrow Elecs., Inc., 910 F.3d 293, 300 (7th Cir. 2018). In cases such as this, where a party has successfully moved to transfer the case from a judicial district in one state to a judicial district in another state, the court applies the choice of law rules of the forum state of the transferor court. Ferens v. John Deere Co., 494 U.S. 516 (1990); Van Dusen v. Barrack, 376 U.S. 612 (1964).

This case was transferred pursuant to 28 U.S.C. § 1404 from the Middle District of Tennessee, [Doc. No. 42], so the choice of law rules of Tennessee must determine which state's laws govern the dispute. For contracts claims, Tennessee applies the law of the jurisdiction where the contract was made, absent contrary intent. Williams v. Smith, 465 S.W.3d 150, 153 (Tenn. Ct. App. 2014). An insurance contract is made wherever the policy is "delivered" to the insured. Goss v. Green, 664 F. App'x 560, 561 (6th Cir. 2016) (citing Ohio Cas. Ins. Co. v. Travelers Indem. Co., 493 S.W.2d 465, 467 (Tenn. 1973)). The parties

agree that Ms. West was domiciled in Florida when she applied for the life insurance policy, so Florida law applies to this dispute.

### B. Statute of Limitations

Florida's statute of limitations for breach of contract is five years. Fla. Stat. § 95.11(2)(b) (2021). A cause of action for breach of contract accrues at the time of the breach, not at the time that consequential damages occur or are discovered. State Farm Mut. Auto. Ins. Co. v. Lee, 678 So. 2d 818, 820 (Fla. 1996); Med. Jet, S.A. v. Signature Flight Support - Palm Beach, Inc., 941 So. 2d 576, 578 (Fla. Dist. Ct. App. 2006).

Wilco argues that Ms. West's claims accrued no later than July 31, 2011, when Wilco is alleged to have improperly increased the monthly cost of insurance rates. Her claims would be time-barred five years later, on July 31, 2016, before she filed suit. Ms. West disagrees. She argues that each time Wilco used the increased cost of insurance rate to deduct from her accumulation value, it committed a separate breach. She contends that any deduction after June 2, 2015 is actionable.[1] Wilco responds by arguing that each deduction wasn't a separate breach but was simply the accumulation of more damages. Because Ms. West's claims must be dismissed if they're time-barred, the court addresses the statute of limitations first.

---

[1] Ms. West notes that she filed her complaint on June 2, 2020, and Wilco terminated her policy in May 2018. She concedes that because of the five-year statute of limitations, her claims are limited to between June 2, 2015, and May 2018.

7

Wilco primarily relies on Jones v. GE Life & Annuity Assurance Co., No. 1:03CV241, 2004 WL 691749, at *2–3 (M.D.N.C. Mar. 17, 2004), for the rule that applying an improperly calculated cost of insurance rate multiple times is a single breach of contract. The Jones court relied on New York Life Insurance Co. v. Statham, 93 U.S. 24 (1876), to hold that "a life insurance contract is to be interpreted as an entire contract for the life of the policy and is not a divisible contract subject to continuous breach." Jones v. GE Life & Annuity, 2004 WL 691749, at *3. The Jones court found it unpersuasive that universal life insurance policies didn't exist when Statham was decided and declined to distinguish Statham. Id.

Whether a life insurance policy is divisible and capable of multiple breaches is better understood by a case Ms. West cites, Fradianni v. Protective Life Insurance Co., 73 A.3d 896 (Conn. App. Ct. 2013). In Fradianni, the plaintiff alleged that the defendant insurance company deducted an improper cost of insurance rate from the plaintiff's accumulated cash value, much like Ms. West's claim. Id. at 897–899. The court held the insurer breached the policy each time it charged the improper rate. Id. at 903. The Fradianni court distinguished Statham and explained that in Statham, "the Supreme Court rejected the insureds' contention that each annual premium payment initiated a new contract for life insurance. The Supreme Court did not decide the question of whether annual overcharges by the insurer may constitute discrete, but recurring, breaches of the contract." Id. at 902; see also Dean v. United of Omaha Life Ins. Co., No. CV 05-6067, 2007 WL 7079558, at *10 (C.D. Cal. 2007) ("[The

8

defendant] fails to explain why the subsequent applications of the inflated rate would not also constitute breaches – what, if anything, is special or unique about the first imposition of the COI charge?"). The Jones opinion read Statham too broadly to be persuasive; Fradianni's analysis of Statham clarifies that life insurance policies can be divisible and breached multiple times, as Ms. West alleges.

Florida law recognizes that single provisions of contracts can be breached multiple times and accords with Fradianni. For instance, in Access Ins. Planners, Inc. v. Gee, 175 So.3d 921 (Fla. Dist. Ct. App. 2015), the plaintiff alleged that the defendant breached a contract provision concerning commission payments each time the defendant withheld commission payments. The court held each withholding was actionable because they were separate, distinct events. Id. at 924. Ms. West argues the deductions were separate since they happened each month and that they were distinct since Wilco was at liberty to vary the deduction month to month.

Wilco argues that Ms. West's allegations are more like those in Dinerstein v. Paul Revere Life Insurance Co., 173 F.3d 826 (11th Cir. 1999), a case in which the insurance company reduced insurance benefits to a claimant once he started receiving Social Security benefits. Wilco likens Ms. West's allegations to the facts in Dinerstein since both involve an insurance company's one-time decision that affected the policyholder every month going forward. Although Dinerstein applied Florida law and is somewhat similar, Wilco too readily dismisses that Dinerstein was about the denial of benefits. See id. at 828–829. The court specifically relied

9

on the rule that "a breach occurs when an insurer first refuses to pay the claim at issue," and explained that "a specific refusal to pay a claim is the breach which triggers the cause of action." Id. at 828–829 (discussing Donovan v. State Farm Fire & Cas. Co., 574 So. 2d 285 (Fla. Dist. Ct. App. 1991)). Ms. West doesn't allege that Wilco denied her benefits each time it applied the cost of insurance rate against her accumulation value but alleges that it deducted an improper amount from her accumulation value each month. According to the contract's terms, that amount could fluctuate, unlike the denial of benefits in Dinerstein. The active and ongoing nature of Wilco's alleged deductions make Ms. West's allegations meaningfully different than a single denial of claims, and her allegations do not fall within the context of Dinerstein

Ms. West has alleged that each application of the allegedly improper cost of insurance rate was a separate breach and none of Wilco's authorities show that Ms. West can only claim that increasing the rate was a breach of contract. Ms. West's claims after June 2, 2015, aren't barred by the statute of limitations.

### C. Breach of Contract

Having determined that the statute of limitations doesn't bar Ms. West's claims, the court turns to whether she has stated a claim for breach of contract. Ms. West claims that Wilco breached the express terms of the insurance policy by charging a cost of insurance rate that was based on improper factors. She also claims that Wilco breached the implied covenant of good faith and fair

10

dealing by abusing its discretion to deprive Ms. Wilco of the benefits she reasonably expected from the policy.

### 1. Express Breach of Contract

A breach of contract under Florida law requires a valid contract, a material breach, and damages. Tech. Packaging, Inc. v. Hanchett, 992 So. 2d 309, 313 (Fla. Dist. Ct. App. 2008). Interpreting an insurance contract is a question of law. Wash. Nat'l Ins. Corp. v. Ruderman, 117 So. 3d 943, 948 (Fla. 2013). Insurance contracts are to be read according to the ordinary rules of contract construction. Valiant Ins. Co. v. Evonosky, 864 F. Supp. 1189, 1191 (M.D. Fla. 1994). The words in the policy, as with any contract, must be given their plain and ordinary meaning, Ebanks v. Ebanks, 198 So. 3d 712, 715 (Fla. Dist. Ct. App. 2016), though an insurance contract should be read as a whole, and a court should seek to give every provision its "full meaning and operative effect." Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000). When an insurance contract is ambiguous, an ambiguity should be construed in favor of the insured, but only when the ambiguity remains after ordinary rules of construction are exhausted. Washington Nat'l v. Ruderman, 117 So. 3d at 947.

Ms. West claims that Wilco breached the contract by considering factors unrelated to mortality and risk to determine her cost of insurance rates. Her claim hinges on two of the policy's provisions. The first provision defines the guaranteed monthly cost of insurance rates at "based on the insured's sex,

attained age and premium class on the date of issue." The same provision goes on to say that "[c]urrent monthly cost of insurance rates will be determined by the company," and "will not be greater than the guaranteed monthly cost of insurance rates." The second provision comes from the Policy Date Page and says, "Actual monthly [cost of insurance] rates will be determined by the Company based on the policy cost factors described in your policy. However, the actual [cost of insurance] rates will not be greater than shown above."

Ms. Wilco argues that when read together, these provisions limit Wilco's discretion in determining cost of insurance rates. The actual monthly cost of insurance rates are "based on the policy cost factors described in your policy," and the policy mentions sex, attained age, and premium class as cost factors. It follows, according to Ms. West, that Wilco breached the contract by considering things other than sex, attained age, and premium class to determine current monthly cost of insurance rates. Wilco responds that a plain reading of the policy shows that those policy factors are only relevant to the "guaranteed rates," not the monthly cost of insurance rates, and that even if Wilco had to consider those factors for the monthly rates, it wasn't limited to those factors because "based on" doesn't imply exclusivity.

Florida courts interpret contracts according to the plain and ordinary meaning of the contract language and give each provision full meaning and operative effect. Ebanks v. Ebanks, 198 So. 3d 712, 715 (Fla. Dist. Ct. App. 2016); Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000). The plain language of the policy unambiguously grants Wilco the discretion to

12

determine actual cost of insurance rates based on things other than sex, attained age, and premium class. Accordingly, Ms. Wilco hasn't stated a claim for breach of contract based on the express terms of the policy.

Ms. West's reading of the policy is unreasonable because the policy defines the guaranteed rate and the monthly cost of insurance rate as two separate rates, and her reading would eliminate that distinction. The policy defines the rates separately—the guaranteed rates "are based on the insured's sex, attained age, and premium class" while the monthly cost of insurance "will be determined by the company" and "will not be greater than the guaranteed monthly cost of insurance rates which are listed on a Policy Data Page." The Policy Date Page confirms that these are separate rates by referring to the rates separately, saying, "Actual monthly cost of insurance rates will be determined by the company based on the policy cost factors described in your policy. However, the actual cost of insurance rates will not be greater than those shown above." The provisions define two separate rates with the purpose of using the guaranteed rate as a ceiling on the monthly rate, which the company otherwise gets to determine. Ms. West's reading would nullify the distinction between the rates and contradict the plain language of the policy. See Anderson v. Wilco Life Ins. Co., No. 20-13482, 2021 U.S. Dist. LEXIS 33846, at *18 (11th Cir. Nov. 15, 2021) ("[G]rafting the guaranteed monthly rate factors onto the current monthly rate provision is untenable because it destroys the guaranteed/current monthly rate distinction, cutting against the plain meaning of the Cost of Insurance Rates provision and even the Policy Date Page caption.").

13

Ms. West responds that Wilco's reading is unreasonable because it makes the provision on the Policy Date Page saying "monthly cost of insurance rates will be . . . based on the cost factors described in your policy" meaningless. The court disagrees, for a few reasons. First, her reading would undermine the distinction between the rates, including the distinction made on that very same page of the policy, as described earlier. Second, it would be unreasonable to take the factors clearly tied to the guaranteed rates and instead tie them to the actual monthly rates. See id. at *20–21. It makes better sense to read the more specific provision (the definition of the cost of insurance rate) as controlling in defining the cost of insurance rate, rather than the less specific provision (the phrase describing the cost of insurance as "based on the policy cost factors described in your policy"). The Policy Data Page is best understood as previewing the more specific definition of the monthly cost of insurance rate, which in this case "will be determined by the company." See id. ("[W]e cannot say that a provision merely previewing something in the policy (*i.e.*, pointing to a future explanation of how the monthly rate is calculated) should control over the policy provision actually doing the thing previewed (*i.e.*, setting forth how the monthly rate is calculated).")

Even if Ms. West were right that the cost of insurance rate must be based on sex, attained age, and premium class, she still wouldn't state a claim for express breach of the policy. To claim that Wilco is limited to certain policies, Ms. West depends on the phrase "based on . . . the policy cost factors described in your policy." She reads the provision to say that the rates must be based exclusively on those factors, while Wilco's would allow for other factors.

14

Fortunately, this isn't uncharted territory. Our court of appeals has interpreted the plain meaning of the phrase "based on" in the same context of cost of insurance rates in life insurance policies. Norem v. Lincoln Benefit Life Co., 737 F.3d 1145, 1149–1150 (7th Cir. 2013). The court in Norem was applying Illinois law, which like Florida law, requires a court to look to the plain and ordinary meaning of a phrase when interpreting a contract. Id. Based on the dictionary definition of "base," the court concluded that the phrase "based on" doesn't imply exclusivity. "[N]o one would suppose that a cake recipe 'based on' flour, sugar, and eggs must be limited only to those ingredients." Id. at 1150. The court concluded that a cost of insurance rate provision that indicated the rates would be "based on" sex, issue, age, policy year, and payment class, would not prohibit the insurer from considering other factors. Id.

Although some courts have rejected the Seventh Circuit's reasoning, the Eleventh Circuit applied the same reasoning when it applied Florida law to interpret a similar insurance policy. In Slam Dunk I, LLC v. Connecticut General Life Insurance Co., 853 F. App'x 451 (11th Cir. 2021), the Eleventh Circuit agreed that a cost of insurance rates provision that indicated the rates would be "based on" certain factors doesn't suggest exclusivity. Such an interpretation was consistent with Florida precedent because reading "based on" to imply exclusivity would "run[] afoul of basic principles of contract interpretation that courts do not add words to contract." Id. at 454.

The policy provisions at issue read the same way as those in Norem and Slam Dunk I. The phrase "actual monthly cost of insurance rates will be

15

determined by the company based on the policy cost factors" doesn't suggest that the company must exclusively rely on the policy cost factors. On the contrary, it suggests that the rates are set to the company's discretion. See Anderson v. Wilco Life Ins. Co., No. 20-13482, 2021 U.S. App. LEXIS 33846 at *14–15 (11th Cir. Nov. 15, 2021) ("Taken together, these provisions demonstrate that Wilco was required to calculate [the] guaranteed monthly rate based on her age, sex, and premium class, but that this rate was distinct from the current monthly rate, which Wilco had discretion to set at any level, so long as it did not exceed the guaranteed monthly rate."); Norem v. Lincoln Benefit Life, 737 F.3d at 1152 ("This sentence ['The rates will be determined by us but they will never be more than the guaranteed rates'] makes clear that [the company] will utilize its own formula to determine the rates, subject to the limitation that they cannot exceed the guaranteed rates.").

Ms. West claims that Wilco breached the contract because it was required to consider certain factors and could consider those factors alone. The plain reading of the contract doesn't support that reading, so Ms. West hasn't stated a claim for express breach of the policy.

### 2. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Ms. Wilco alleges that even if Wilco didn't breach the express terms of the contract, it imposed unreasonable cost of insurance rates that frustrated the policy's purpose and undercut the policyholders' reasonable expectations.

Compl. paras. 156–160. Ms. Wilco argues that these allegations amount to breach of the implied covenant of good faith and fair dealing.

Florida's implied covenant of good faith and fair dealing is a "gap-filling default rule" meant to protect one party's reasonable expectations when a contract grants substantial discretion for the other party to pursue its self-interest. Publix Super Mkts., Inc. v. Wilder Corp. of Del., 876 So. 2d 652, 654–655 (Fla. Dist. Ct. App. 2004). When a contract grants one party substantial discretion, the covenant "nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party." Cox v. CSX Intermodal, Inc., 732 So. 2d 1092, 1097–1098 (Fla. Dist. Ct. App. 1999). Even a party granted "sole discretion" must abide by the covenant of good faith and fair dealing. Sepe v. City of Safety Harbor, 761 So. 2d 1182, 1184–1185 (Fla. Dist. Ct. App. 2000). The implied covenant doesn't vary the express terms of a contract, though, and comes into play when the contract doesn't specify standards. Publix, 876 So. 2d at 654–655.

Wilco argues that Ms. West hasn't stated a claim for breach of the implied covenant of good faith and fair dealing because the guaranteed insurance rate limited Wilco's discretion to determine actual monthly cost of insurance rates. According to Wilco, because the current monthly rates can't exceed the guaranteed rates, Wilco's discretion is subject to standards, and this isn't the sort of case where "one party has the power to make a discretionary decision without defined standards." Id. at 652.

17

The contract gives substantial discretion to Wilco, making these allegations exactly the sort that the implied covenant of good faith and fair dealing is meant to cover. The terms of the contract say that "[c]urrent monthly cost of insurance rates will be determined by [Wilco]." As discussed earlier, and as Wilco argued, this language gives substantial discretion for Wilco to set the cost of insurance rates, untethered to mortality-risk factors. Wilco is right that the guaranteed cost of insurance rates sets a ceiling for the actual cost of insurance rates, but there are no standards or guidelines for the substantial discretion below the ceiling. Florida law doesn't require absolute discretion to invoke the implied covenant—it's when a party has "substantial discretion" that "the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party." Cox v. CSX Intermodal, 732 So. 2d at 1097–1098; see Publix v. Wilder Corp., 876 So. 2d at 654 ("[The implied covenant] is usually raised when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards.") (quoting Sepe v. Safety Harbor, 761 So. 2d at 1185).

Ms. West alleges that she and other policyholders reasonably expected that the cost of insurance rates wouldn't be used to prevent beneficiaries from receiving death benefits. She alleges that Wilco projected their plans to last a decade longer than they did, reinforcing expectations that rates would stay somewhat consistent and the plans would last. Compl. paras. 62–78, 156–159. She alleges that Wilco did this to make up for lost profits caused by self-dealing

and poor business decisions. She alleges that Wilco intentionally raised the cost of insurance rates exorbitantly so that policyholders would surrender their policies or let them lapse. The implied covenant of good faith and fair dealing is meant to protect one party's reasonable expectations when a contract grants substantial discretion for the other party to pursue its self-interest. Publix v. Wilder Corp. 876 So. 2d at 654–655. Ms. Wilco has stated a claim under Florida's implied covenant and accordingly, Wilco's motion to dismiss on these grounds must be denied.

### D. Twombly/Iqbal Standard

Wilco argues that Ms. West's complaint hasn't satisfied the "plausible" standard of Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Wilco argues that the allegations that Wilco raised cost of insurance rates based on improper factors and for improper reasons is speculative, like the antitrust claims in Twombly. Although the parties focused on the breach of contract claim based on express provisions of the contract, their arguments apply largely with equal force to Ms. West's claim under the implied covenant of good faith and fair dealing.

Ms. West alleges that Wilco raised the cost of insurance rates to case widespread policy surrenders and lapses ("shock lapse strategy"). Compl. paras. 8, 122–124, 158. Her allegations specifically allege that Wilco raised the rates to cause Ms. West and others to lose coverage, contrary to their reasonable expectations that were reinforced by Wilco. She also alleges detailed and specific

19

reasons why Wilco was in a position to raise cost of insurance rates and explains why doing so would be in Wilco's self-interest Although Wilco analogizes to the parallel business conduct that would be consistent with liability in Twombly, Ms. West's allegations allege Wilco of specific conduct that violated the implied covenant. Cf. EFG Bank AG v. Lincoln Nat'l Life Ins. Co., Civ. No. 17-02592, 2017 WL 4222887, at *4 (E.D. Penn. Sept. 22, 2017); Feller v. Transamerica Life Ins. Co., No. 1:16-cv-01378, 2016 WL 6602561, *11–13 (C.D. Cal. Nov. 8, 2016); DCD Partners, LLC v. Transamerica Life Ins. Co., No. 2:15-cv-03238, 2015 WL 5050513, *6–8 (C.D. Cal. Aug. 14, 2015). Ms. West alleges that Wilco raised cost of insurance rates to achieve a bad faith purpose and provides multiple specific theories for why Wilco was motivated to do so. These aren't threadbare or speculative, but are plausible. The court denies Wilco's motion to dismiss.

## IV. Conclusion

Based on the foregoing and because Ms. West has stated a claim for breach of the implied covenant of good faith and fair dealing, the court DENIES the defendant's motion to dismiss.

SO ORDERED.

ENTERED:   December 8, 2021

/s/ Robert L. Miller, Jr.
Judge, United States District Court

Distribution: All electronically registered counsel or record