UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SHERRI WEST,                              )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )      No. 1:20-cv-02961-RLM-MKK
                                          )
WILCO LIFE INSURANCE COMPANY,             )
                                          )
            Defendant.                    )

## <u>ORDER</u>

This matter comes before the Court on the Plaintiff's Motion to Compel, Dkts.

[108 (unredacted sealed version of motion)], [111 (redacted public version of

motion)]. The Motion was referred to the undersigned and, for the reasons that

follow, is hereby **GRANTED IN PART** and **DENIED IN PART**.

## I.    Background[1]

From 1994 to May 2018, Plaintiff Sherri West had a universal life insurance

plan with Defendant Wilco Life Insurance.[2] (Dkt. 1 at 2, 5). As previously described

by the Court:

---

[1] This synopsis does not constitute factual findings. Rather, this summary draws on the various filings in this case and is intended only to provide context for the discovery disputes resolved by this Order.

[2] West originally purchased her policy from American Life and Casualty Insurance Company, an entity which was later sold to Conseco Life Insurance Company. (Dkt. 1 at 5). In 2011, Wilco—then doing business as Conseco Life Insurance Company—was a subsidiary of CNO Financial Group, Inc. (Dkt. 112 at 10 n.5). Wilton Re Holdings Ltd. ("Wilton Re") acquired Conseco in 2014, pursuant to a Stock Purchase Agreement, and Conseco Life Insurance Company changed its name to Wilco Life Insurance Company. (*Id.*). In December 2020, Wilco merged with another Wilton Re subsidiary and now conducts business as part of the surviving entity, Wilcac Life Insurance Company. (*Id.*). For simplicity, the Court will refer to these entities (regardless of the particular time frame being discussed) as "Wilco," understanding that it may in fact be referring to one of Wilco's predecessors.

A universal life insurance plan allows a policyholder to accumulate savings while alive by paying flexible premiums. When a policyholder pays a premium, that premium is added to the policyholder's accumulation value. Each month, the accumulation value accrues interest and each month the insurance company deducts costs from the accumulation value. As long as the accumulation value is greater than the next month's costs, the policy remains in force. If the accumulation value is depleted by monthly costs, the policy lapses and the policyholder loses coverage. If the policy is still in force upon the policyholder's death, the policyholder's beneficiaries receive a death benefit. If the insurance company increases the monthly cost of insurance rates, either the accumulation value depletes at an earlier date or the policyholder must pay higher premiums to maintain the accumulation value.

(Dkt. 67 at 2-3). In July 2011, Wilco raised the cost of insurance ("COI") rate. (Dkt. 1 at 15). West continued paying her premiums until 2018, when the monthly COI increased beyond her policy's accumulation value and her policy lapsed. (*Id.* at 17).

After losing her policy, West filed this lawsuit, a putative class action, in which she alleges her policy lapsed as part of Wilco's "shock lapse strategy." (*Id.* at 3). As alleged, this "strategy" entailed Wilco significantly increasing COI rates, in defiance of policyholders' reasonable expectations, with the goal of causing a high number of policy surrenders and lapses. (*Id.*). With fewer policies on the books, Wilco could increase its profits and recover past losses. (*Id.*). This, West alleged, constituted a breach of contract. (*Id.* at 36-39).

Following the Court's order on Wilco's motion to dismiss, West's sole claim is that Wilco breached the implied covenant of good faith and fair dealing. (Dkt. 67). More specifically, West alleges that "each application of the allegedly improper [COI] rate was a separate breach." (*Id.* at 10). West has plausibly alleged breaches between June 2, 2015 (the start of the limitations period) to May 2018 (the date of her policy lapse). (*Id.* at 7-10).

## II.     Discovery Dispute

In the Motion now before the Court, West seeks to compel Wilco to produce 3 categories of information, which she says are responsive to 14 of her document requests (Nos. 1, 2, 25, 43, 46, 51, 56, 57, 59, 60, 61, 66, 67, 70) and 7 of her interrogatories (Nos. 18-23, 25). (Dkt. 112).[3]

The three categories are: 1) post-repricing documents related to Wilco's 2011 increase of COI rates and expense charges and its financial condition; 2) Wilco's 2010 Regulatory Settlement Agreement and related documents; and 3) documents produced and/or sought in lawsuits involving a different policy block (the LifeTrend litigation). (Dkt. 112 at 5). Broadly speaking, West contends the information she seeks in these categories goes towards establishing her claim, demonstrating damages, refuting Wilco's affirmative defenses, and facilitating class certification. (*Id.* at 20-23). Wilco objects to these requests because, among other things, they are "neither relevant to the parties' claims and defenses nor proportional to the needs of the case." (Dkt. 117 at 10).

After "meet and confers" failed to resolve the disputes, West turned to the Court. And after two discovery conferences, the Court permitted West to move to compel the production of and responsiveness to these matters. (Dkts. 105, 107). That Motion is now before the Court. (Dkts. 108, 111).

---

[3] The parties filed both redacted and unredacted versions of their briefs and exhibits. The Court has made every effort to ensure that this Order does not contain any confidential information, including when citing to any of the sealed exhibits. The parties should contact the Court immediately if the opinion contains any confidential information.

This Order cites to the page numbers as they appear in the headers of the documents.

### III.   Applicable Law

### A.   Discovery

Discovery is a mechanism to avoid surprise, disclose the nature of the controversy, narrow the contested issues, and provide the parties a means by which to prepare for trial. 8 Wright & Miller, *Federal Practice and Procedure* § 2001 (3d ed.) (updated Apr. 2022). To accomplish these goals, the discovery rules are liberally construed. *Spier v. Home Ins. Co.*, 404 F.2d 896 (7th Cir. 1968). Magistrate judges enjoy extremely broad discretion in controlling discovery. *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013); *see also Conroy v. Select Med. Ciro.*, 307 F. Supp. 3d 896, 901-02 (S.D. Ind. 2018) (collecting cases).

Rule 26 of the Federal Rules of Civil Procedure "contains the central provisions on scope of discovery that control all the particular discovery devices." 8 Wright & Miller, *Federal Practice and Procedure* § 2001 (3d ed.) (updated Apr. 2022); *see, e.g.*, Fed. R. Civ. P. 33(a)(1) & 34(a). Rule 26(b)(1) permits the discovery of any nonprivileged matter "that is relevant" to a party's claim or defense and "proportional" to the needs of a case, considering the importance of the issues at stake, the importance of the discovery in resolving those issues, the amount in controversy, and the weighing of burdens and benefits. Fed. R. Civ. P. 26(b)(1). Central then to any discovery dispute is relevancy. *Id.*

A party may seek an order to compel when an opposing party fails to respond to discovery requests or provides evasive or incomplete responses. Fed. R. Civ. P. 37(a)(2)-(3). "After the moving party establishes relevancy of the sought

information, the burden shifts to the objecting party to show why a particular discovery request is improper," *Bell v. Pension Comm. of ATH Holding Co., LLC*, 330 F.R.D. 517, 520 (S.D. Ind. 2018), and to explain precisely why its objections are proper. *See* Fed. R. Civ. P. 33(b)(4) ("The grounds for objecting to an interrogatory must be stated with specificity."); Fed. R. Civ. P. 34(b)(2)(B) ("For each item or category, the response must…state with specificity the grounds for objecting to the request including the reasons."); *Graham v. Casey's General Stores*, 206 F.R.D. 251, 254 (S.D. Ind. 2002).

## B.    Law Governing Contract Claim

Knowing what's relevant requires knowing what the party's claims or defenses are, which in turn requires knowing the governing law.

Florida law governs West's claim. (Dkt. 67 at 7). Under that law, the implied covenant of good faith and fair dealing serves as a "'gap-filling default rule' meant to protect one party's reasonable expectations when a contract grants substantial discretion for the other party to pursue its self-interest." (*Id.* at 17 (citing *Publix Super Mkts., Inc. v. Wilder Corp. of Del*, 876 So. 2d 652, 654-55 (Fla Dist. Ct. App. 2004)). It "is meant to protect one party's reasonable expectations when a contract grants substantial discretion for the other party to pursue its self-interest." (Dkt. 67 at 19 (citing *Publix Super Mkts.*, 876 So. 2d at 654-55)). When one party holds "substantial" or even "sole" discretion under a contract, the implied covenant "nevertheless limits that party's ability to act capriciously to contravene the

reasonable contractual expectations of the other party." (Dkt. 67 at 17 (quoting *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097-98 (Fla. Dist. Ct. App. 1999)).

## IV. Discussion

Against this backdrop, the Court now turns to the disputes before it. Regrettably, the organization of the parties' briefs did little to aid the Court in determining which discovery requests are truly at issue. West lists the specific items she wishes to compel, (*see* Dkt. 112 at 13-18), but then argues in terms of "categories" of information, (*see id.* at 20-31). Wilco's response only partially adopts West's organizational structure, (*see* Dkt. 117 at 25-34), and fails to specifically respond at all to some of the requested items, (*see id.* at 20-34).[4] While the Court appreciates attempts to streamline unwieldy arguments, a specific, item-by-item approach would have been of more assistance in this sort of dispute,[5] as that is what the Court must do: rule in specifics, not in generalities. But before turning to individual requests, the Court will first address Wilco's overarching relevancy objection.

---

[4] Any objections lodged by Wilco in its initial responses to West's discovery requests but not raised in its brief are considered abandoned and are not considered here. *See Flomo v. Bridgestone Americas Holding, Inc.*, No. 1:06-cv-00627-DFH-JMS, 2009 WL 10688034, at *3 n.4 (S.D. Ind. June 16, 2009) ("While [Defendant's] written responses assert additional objections…[it] ha[s] abandoned those objections by not arguing them in response to the Motion to Compel."); *United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is a good point despite a lack of supporting authority or in the face of contrary authority, forfeits the point.") (emphasis and citations omitted).

[5] Wilco noted a list of information that it "has produced and is supplementing production of." (Dkt. 117 at 11-12). To the extent Wilco requests (or its argument requires) that the Court match up these productions with Plaintiff's requests, the Court declines to do so. *See Art Akiane LLC. v. Art & Soulworks LLC*, No. 19 C 2952, 2020 WL 5593242, at *4 (N.D. Ill. Sept. 18, 2020) ("[A] court ought not to do organizational tasks that could and ought to have been done by counsel").

## A.    Relevance of Post-Repricing Information

The heart of the present dispute is relevancy: the parties take opposite positions regarding the relevancy of post-repricing information.[6]

West argues that her requests seek information needed to prove Wilco engaged in a shock-lapse strategy. (Dkt. 112 at 20-21). To prove the existence of this strategy, she asserts, she must analyze the post-repricing impact of increased charges and that can only be done by examining post-repricing data. West also cites to cases for the position that establishing a genuine issue of material fact regarding an insurer's profit goals can be achieved by comparing its assumptions regarding anticipated experience and profitability at policy pricing to actual anticipated factor experience and profitability after the challenged nonguaranteed element (NGE) redetermination. (*Id.* at 21 (citing *Hanks v. Voya Ret. Ins. & Annuity Co.*, 492 F. Supp. 3d 232, 249 (S.D.N.Y. 2020); *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 481 (S.D.N.Y. 2014))).

On those grounds, West argues, with particularity, that she will use post-repricing data to prove liability, damages, and the appropriateness of class certification. (Dkt. 112 at 21-22). She further asserts that she will use the information sought to undermine Wilco's defense "that the 2011 increase was 'consistent with the parties' expectations under the contract, commercially reasonable, and neither arbitrary nor capricious.'" (Dkt. 112 at 22 (quoting Wilco's Answer)).

---

[6] As used herein, the terms "post-2011" and "post-repricing" serve as shorthand to refer to the period following Wilco's increase of the COI rate and expense charges in or around July 2011.

In response, Wilco says the requested information is neither relevant nor proportional because any "[p]ost-2011 information has no bearing on whether the increase was reasonable based on the information available to Wilco when it implemented the 2011 COI rate increase." (*E.g.*, Dkt. 117 at 27).

As noted above, the threshold question for the Court is whether West has demonstrated that the requested information is relevant to "any party's claim or defense." Fed. R. Civ. P. 26(b)(1); *see also Struve v. Gardner*, No. 1:19-cv-04581-RLY-MJD, 2020 WL 9602038, at *1 (S.D. Ind. Dec. 10, 2020) ("[T]he burden of demonstrating relevance is on the party seeking discovery, [but] once relevance has been shown, it is the objecting party's obligation 'to show why a particular discovery request is improper.'") (quoting *Kodish v. Oakbrook Terrace Fire Protection Dist.,* 235 F.R.D. 447, 449-50 (N.D. Ill. 2006)). Based on Wilco's response to West's motion to compel, a few points bear noting before proceeding further.

First, relevancy under Rule 26 does not equate to relevancy under Federal Rule of Evidence 401. *See Doe v. Loyola Univ. Chicago*, No. 18 CV 7335, 2020 WL 406771, at *3 (N.D. Ill. Jan. 24, 2020) ("Because discovery is concerned with 'relevant information' not 'relevant evidence' the scope of relevance for discovery purposes is necessarily broader than it is for trial evidence under Federal Rule of Evidence 401."). The question of admissibility is not before the Court at this stage. Fed. R. Civ. P. 26(b)(1) ("Information within the scope of discovery need not be admissible in evidence to be discoverable."). "Relevance in discovery is broader than relevance at trial; during discovery, a broad range of potentially useful information

8

should be allowed when it pertains to issues raised by the parties' claims." *Freeman v. Ocwen Loan Servicing, LLC*, No. 1:18-cv-03844-TWP-DLP, 2022 WL 999780, at *2 (S.D. Ind. Apr. 4, 2022) (internal citations and quotation marks omitted). A discovery dispute only requires the Court to determine, as a threshold matter, if the requesting party met its burden of showing that the information sought is "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).

Second, the merits of any party's particular claim or defense are not before the court at this stage. Of course, "a party's 'claim' is susceptible of broad to narrow descriptions." *U.S. ex rel. McCartor v. Rolls-Royce Corp.*, No. 1:08-cv-00133-WTL-DML, 2013 WL 5348536, at *2 (S.D. Ind. Sept. 24, 2013). But focusing on "whether the 'claim' can or should be described broadly or narrowly" is not "particularly helpful" in resolving discovery disputes—let alone as an "analytical touchstone . . . to dictate the scope of discovery." *Id.* That is because "a party is entitled to seek discovery on its theory of the facts and the law, and is not limited in discovery by the opponent's theory." 8 Wright & Miller, *Federal Practice and Procedure* § 2001 (3d ed.) (updated Apr. 2022); *see also Exec. Mgmt. Servs., Inc., et al. v. Fifth Third Bank*, No. 1:13-cv-00582-WTL-MJD, 2014 WL 5529895, at *4-6 (S.D. Ind. Nov. 3, 2014) (rejecting defendant's attempt to unilaterally dictate scope of discovery for plaintiffs' remaining claim). Accordingly, the question of relevance turns on the claims and defenses put forth in the parties' pleadings. *See United States v. Farley*, 11 F.3d 1385, 1390-91 (7th Cir. 1993) ("The discovery proposed here is not relevant to the issue presented by the government's complaint[.] … Nor is the proposed

discovery relevant to any of Farley's affirmative defenses."); *Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 722 (N.D. Ill. 2014) ("It must not be forgotten that relevance for discovery purposes does not exist in the air. It is a function of the claims and defenses in the case.") (citing Fed. R. Civ. P. 26(b)(1)).

Against this backdrop, the Court finds West has carried her burden of demonstrating that discovery regarding post-repricing documents is relevant to the claims and defenses in this case. And Wilco has failed to show that this material "'is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure.'" *7E Fit Spa Licensing Grp. LLC v. 7EFS of Highlands Ranch, LLC*, No. 1:15-cv-01109-TWP-MPB, 2016 WL 2735932, at *2 (S.D. Ind. May 9, 2016) (quoting *Sanyo Laser Products, Inc. v. Arista Records, Inc.*, 214 F.R.D. 496, 499 (S.D. Ind. 2003)).

As noted in Judge Miller's Order, West's claim is not isolated to a single breach of contract in 2011, at the time of the COI rate increase (Dkt. 67 at 10). Instead, West has stated a plausible claim that Wilco made improper COI deductions on a monthly basis *starting* in 2011 and that the alleged bad acts and resulting harm continued throughout the policy's lifetime. (*Id*.).

So if the reasonableness of Wilco's decision to increase COI rates in 2011 turns on the information it had available at that time (a point that Wilco appears to concede, (Dkt. 117 at 22)), then it follows that the reasonableness of Wilco's subsequent decisions to continue making monthly deductions at that higher rate (a rate that it could have decreased) turned on the information available to it at the

time of each monthly deduction. Therefore, the information available to Wilco at the time of each monthly deduction is relevant to West's claims and, accordingly, is within the scope of discoverable information.

The undersigned agrees with West that the post-repricing material relates to multiple aspects of the claims and defenses of the case. First, the information requested could help West prove the "shock lapse" theory underlying her claim. For example, a comparison of pre- and post-2011 lapse and surrender rates could assist West in showing that the shock-lapse strategy occurred and that it ultimately succeeded. Relatedly, this information may assist her in establishing (or assist experts with opining on, as appropriate) the causes of the lapses and surrenders. Information regarding Wilco's financial situation at the time of any particular deduction might inform whether its actions violated the reasonable expectations of the policyholders. So too, comparing Wilco's assumptions at any particular time regarding experience, profitability, and other factors to the subsequent reality may go towards proving (or disproving) Wilco's motives for rate increases.[7]

Ongoing (*i.e.*, post-2011) policy and financial information is also relevant to damages. Determining the extent to which high premiums resulted from rate increases versus other factors requires an analysis of post-repricing data. Similarly, calculating damages entails an examination of how, if at all, the increased rates decreased the value of the forfeited policies.

---

[7] It bears repeating that the question of whether Wilco's actions resulted from bad faith, bad math, or something else altogether is not before the Court. The only issue here is whether the information sought could help answer that question and otherwise satisfies the requirements of Rule 26.

Given its relevance to issues such as the existence of a breach, causation, and damages, the post-repricing information also relates to issues of class certification. *See, e.g.*, *Burnett v. CNO Financial Group, Inc.*, No. 1:18-cv-200-JPH, 2022 WL 896871, at \*9-16 (S.D. Ind. Mar. 25, 2022) (addressing issues of causation, damages, and governing law in the class certification context). For the same reasons, West's argument that she requires state-by-state data to address issues of class predominance and manageability is well taken. *See id.* at \*16-20 (discussing predominance and manageability).

On a final note, Wilco contends that West's attempt to discover post-repricing information to show that Wilco acted in bad faith by considering profit motives in adjusting COI rates "is not meritorious" based on Seventh Circuit precedent. (Dkt. 117 at 24). Wilco cites to *Norem v. Lincoln Ben. Life Co.*, in which the Seventh Circuit noted that "it is not unreasonable in a universal life insurance policy to consider profit as a secondary factor in calculating the COI rate." (Dkt. 117 at 24-25) (quoting 737 F.3d 1145, 1155 (7th Cir. 2013)).

The *Norem* case is inapposite. As an initial matter, *Norem* involved an alleged breach of "the express terms of [the] COI rate clause," not the implied covenant of good faith and fair dealing. 737 F.3d at 1147. And, perhaps more significantly, West is not alleging that Wilco was prohibited from considering profit altogether, but instead that Wilco considered profit "in a way that undercut[] Plaintiff's reasonable expectations in violation of the implied covenant of good faith and fair dealing . . . ." (Dkt. 123 at 12). *Norem* does not negate the relevance of

information available to Wilco at the time it imposed higher monthly charges on policyholders.

Based on all of the above, the Court concludes post-repricing information is within the scope of discovery.

## B.   Post-Repricing Documents

Having addressed Wilco's overarching objection that post-repricing documents are not relevant, the Court now turns to West's specific requests. Broadly speaking, West's post-repricing requests pertain to the post-2011 performance and profitability of the policies and Wilco's post-2011 financial status. (Dkt. 112 at 13-15).[8]

### 1.   <u>Request Nos. 51 and 60</u>

West first asks the Court to compel the production of certain policy block data and asserts that Wilco's responses to Requests for Production (hereinafter, "Requests") Nos. 51 and 56 were inadequate. (Dkt. 112 at 13). West focuses on a spreadsheet that Wilco has already produced containing policy block data, Exhibit 6 to her filing. (*Id.* at 23-24). In its response, Wilco discusses the spreadsheet[9] and specifically addresses Requests Nos. 51 and 60. (*See* Dkt. 117 at 25). The Court will

---

[8] As mentioned, the organization of the parties' briefs did little to aid structuring the following analysis by speaking in generalities rather than discussing specific disputed discovery requests. The Court has done its best to efficiently, but thoroughly, address each specific request.

[9] Although not completely clear from the parties' filings, the Court presumes that West and Wilco are both referring to the same spreadsheet, *i.e.*, Plaintiff's Exhibit 6, (Dkt. 109-7; *see also* Dkt. 109-8 at 25 (deposition testimony regarding spreadsheet)).

now address Request Nos. 51[10] and 60; Request No. 56 is addressed in a subsequent section.

Although West does not articulate pursuant to which (if any) specific request she received the spreadsheet, she asks the Court to compel Wilco to "produce (in .pdf and native format) an updated version of the spreadsheet attached as Exhibit 6 [Dkt. 109-7] that outlines the additional COI and expense charges Wilco collected since 2013 due to the 2011 monthly COI rate and expense charge increase, as well the documents and individual policy level data underlying Wilco's spreadsheet." (Dkt. 112 at 23). The spreadsheet, West argues, is "incomplete" and included "no native file or underlying data or documents referenced by Wilco to corroborate the figures." (*Id.* at 14).

In its response, Wilco states that it has "produced a spreadsheet . . . that contains policy block data since approximately 2013." (Dkt. 117 at 25). The spreadsheet, Wilco states, "contains extensive information relating to the COI charges, expense charges, lapses, surrenders, and death benefits paid for the CUL and CIUL2 policies individually, collectively, and by state." (*Id.*). Wilco asserts that this "extensive production should satisfy the majority of what Plaintiff might need for damages or class certification issues" and is responsive to Requests Nos. 51 and 60. (*Id.*).

---

[10] Both parties incorrectly identify Plaintiff's Document Request No. 51 as No. "50." Based on the information sought, the text of the document request put forth in the briefing for the present motion, and review of Plaintiff's First Request for Production of Documents, (Dkt. 109-3), the Court believes the parties meant No. 51 and uses that number herein.

West disagrees that the spreadsheet provides a sufficient response to Request No. 51. While she agrees that the spreadsheet contains actual data (and is sufficient "to show the additional charges that Wilco collected," (Dkt. 123 at 12)), she argues that it falls short by not including "Wilco's expectations or projections regarding lapses and surrenders," items encompassed by Request No. 51. (*Id.* at 12-13).

The Court turns, as it must, to the specific requests at issue:

- **Request No. 51**: "All Documents[11] Concerning the expected, projected and/or actual impact of the Monthly COI Rate Increase on mortality, surrender and/or lapse rates, all assumptions made in connection with any such projections and the bases, source documents and support for all such assumptions." (Dkt. 109-3 at 38).
- **Request No. 60**: "Documents sufficient to show the amount of additional Monthly Deductions that Wilco collected following the Monthly COI Rate Increase." (Dkt. 109-3 at 45).

As described above, West has made an adequate showing at this stage that information known to Wilco and the factors going into its decision to increase COI rates (or maintain rates at the higher level) is relevant to her claim. So too is information pertaining to the disparity between expected or anticipated gains and actual gains, as set forth above. As such, she is entitled to the information she seeks in Requests No. 51 and 60.

To the extent Wilco asserts that its production to date is sufficient and "should satisfy the majority of what Plaintiff might need," it has not provided the Court with a sufficiently detailed explanation as to why that is true. Nor has it clearly articulated a basis on which the Court can find that what Plaintiff seeks is overly broad or not proportional to the case. To borrow language from another

---

[11] The capitalized words were defined in the discovery requests. (*See, e.g.*, Dkt. 109-3 at 3).

Seventh Circuit district court, "[Wilco] does not get to decide that the spreadsheet already produced should be the entire universe of Plaintiff's [shock lapse strategy] evidence." *Aptargroup, Inc. v. 3M Co.*, No. 17 C 6294, 2018 WL 11189351, at *3 (N.D. Ill. May 25, 2018).

For these reasons, Plaintiff's Motion to Compel is GRANTED with respect to Plaintiff's First Request for Production Nos. 51 and 60. Wilco **shall produce all documents responsive to those requests (including an updated spreadsheet, if responsive)** within 28 days of this Order.

### 2.   <u>Interrogatories 18, 19, and 25</u>

As part of the same discussion, West also seeks full answers to Interrogatories 18, 19, and 25. (Dkt. 112 at 24; Dkt. 109-4 at 22-24 (Interrogatories 18, 19); Dkt. 109-6 at 5-6 (Interrogatory 25)). West contends that the answers to these interrogatories, in combination with the spreadsheet referenced above (Exhibit 6), will "demonstrate Wilco's shock-lapse strategy" and inform the issue of damages. (Dkt. 112 at 24).

Wilco's response does not address these interrogatories or its original objections to them. As such, Wilco has "abandoned those objections by not arguing them in response to the Motion to Compel." *Flomo*, 2009 WL 10688034, at *3 n.4.

In general, Interrogatories 18 and 19 seek information about "the number of CUL [and CIUL2] policies that have been surrendered or have lapsed (terminated) due to inadequate funding since the Monthly COI Rate Increase and the face value of the surrendered or terminated CUL policies." (Dkt. 109-4 at 22-23). Interrogatory

25 seeks state-by-state data about in-force, lapsed, and surrendered policies. (Dkt. 109-6 at 5; *see* Dkt. 109-7 (Plaintiff's Exhibit 6, which appears to contain state-by-state breakdowns)).

For the reasons set forth above, these interrogatories are relevant to West's claims and will likely assist her with not only proving her case, but also determining any potential damages and establishing the class.

Because these requests are relevant to West's claims and proportional to her case and because Wilco has not articulated any objection, Wilco **shall fully answer Interrogatories 18, 19, and 25** within 28 days of this Order.

### 3.    <u>Interrogatories 20, 21, 22, and 23</u>

In her discussion of the general category of post-repricing documents, West also asks the Court to compel responses to Interrogatories 20, 21, 22, and 23. (Dkt. 112 at 15, 18; Dkt. 109-4 at 24-26 (Interrogatories 20-23)).

Wilco's response does not address these interrogatories or its original objections to them. As such, Wilco has abandoned those objections.

In general, Interrogatories 20, 21, 22, and 23 seek information regarding the impact of the COI rate and expense charge increases on monthly deductions. (Dkt. 109-4 at 24-27). As with the previous set of interrogatories, these requests are relevant to West's claims and will likely assist her in not only proving her case, but also determining the class and any potential damages.

Because these requests are relevant to West's claims and proportional to her case and because Wilco has not articulated any objection, Wilco **shall fully answer Interrogatories 20, 21, 22, and 23** within 28 days of this Order.

Additionally, it appears—and West maintains, (Dkt. 112 at 15)—that Wilco has not verified its responses to Plaintiff's First Set of Interrogatories, which include Interrogatories Nos. 18, 19, and 20 to 23. (*See* Dkt. 109-4). Rule 33(b) requires that answers to interrogatories be verified and signed by the person answering the interrogatory, not only by the party's attorney. Fed. R. Civ. P. 33(b)(5); *see also Villareal v. El Chile, Inc.*, 266 F.R.D. 207, 210-12 (N.D. Ill. 2010) (discussing significance of verification of interrogatories). As such, when responding to this Order, Wilco must provide proper verification for all its answers to the foregoing interrogatories.

### 4. <u>Request Nos. 25, 43, 46, 56, 57, 59 and 61</u>

In addition to specific policy block data, West also requests information pertaining to testing of and predictions about the policies' performance as well as data about the policies' impact on Wilco's profits. Under this broad umbrella, West requests the Court to compel responses to Request Nos. 25, 43, 46, 56, 57, 59, and 61, which read as follows:

- **Request No. 25**: "All Documents Concerning the management, the financial performance, the profitability, and any losses associated with the CUL and CIUL2 Products, including but to limited to any evaluation of the past financial performance of the CUL and CIUL2 Products prior to the Monthly COI Rate Increase." (Dkt. 109-3 at 17).
- **Request No. 43**: "All Documents Concerning the 'review of [redacted].' *See* WILCO_000003." (Dkt. 109-3 at 32).

18

- **Request No. 46**: "All annual NGE certifications Concerning the CUL and CIUL2 Products, including the two NGE certifications identifying CUL and CIUL2 Products [redacted].' *See id.* [WILCO_000004]." (Dkt. 109-3 at 34).
- **Request No. 56**: "All experience studies for mortality, investment returns, earnings, terminations, lapses, surrenders, premium payment persistency and other experience reviewed by Wilco's actuaries or consultants for the CUL and CIUL2 Products before and after the Monthly COI Rate Increase, whether aggregated or separated, including all subsets of the data studies such as gender, smoking status, and policy face amount." (Dkt. 109-3 at 42).
- **Request No. 57**: "All Documents concerning repricing, review, cash flow testing, asset adequacy analysis, evaluation, lapse or self-support test of the CUL and CIUL2 Products as defined by the Life Insurance Illustrations Model Regulation and/or valuation." (Dkt. 109-3 at 43).
- **Request No. 59**: "All annual statements covering CUL and CIUL2 Products impacted by the Monthly COI Rate Increases provided to state insurance departments for the years 2001 to the present." (Dkt. 109-3 at 44).
- **Request No. 61**: "Documents sufficient to show the actual impact the Monthly COI Rate Increase on CUL and CIUL2 Products had on Wilco's capital, internal rates of return, and present values of distributable earnings." (Dkt. 109-3 at 45).

Once again, with some exceptions, the parties fail to tie their arguments closely to specific requests, exaggerating the difficulty of the task before the Court.[12]

Despite this lack of precision, the parties' arguments are relatively straightforward. West asserts that documents relating to the policies' predicted and actual performance and impact on Wilco's profits will help her show that Wilco violated the implied covenant by unreasonably taking its own profits into

---

[12] For example, West offers little in terms of explaining the information sought in Request No. 43. The Request's citation to WILCO_000003, (Dkt. 109-2 at 4), makes obvious, however, that the Request seeks production of documents relating to the Actuarial Report which, as discussed in further detail below, is relevant to the case at hand.

Similarly, Wilco does not specifically address Request Nos. 43, 46, 56, or 57. A careful (and patient) reader can match its arguments to those requests, however. In the interest of advancing the case, the Court will address the merits of each of these requests and Wilco's objections thereto.

consideration. (*See, e.g.*, Dkt. 112 at 24-26). Such documents include experience studies, illustration testing, cash flow testing, and embedded value documents, as well as annual regulatory statements. (Dkt. 112 at 24-26).

Wilco objects to the requested production for several reasons. First, it asserts that the information is not relevant because it post-dates the 2011 rate change. (*See, e.g.*, Dkt. 117 at 26 ("The annual statements . . . relate to information after the fact—after 2011—which has no bearing on the reasonableness of Wilco's decision in 2011.")). The Court has already overruled this objection. As set forth above, post-repricing information is relevant to this case.

Next, Wilco objects to the financial-information requests, found in Request Nos. 25, 59, and 61, because they "seek[] extensive, generalized discovery concerning Wilco's financial standing." (Dkt. 117 at 25). The Court agrees with Wilco that a party's financial records are not automatically discoverable. *See, e.g.*, *Bradley Corp. v. Lawler Mfg. Co.*, 2020 WL 10486335, at *6 (S.D. Ind. May 1, 2020) ("In this court's view, proportionality concerns counsel against requiring a company or individual to give access to its entire financial data . . . without a strong showing that access to the database is reasonably necessary to a fair prosecution of one's claims."); *Henderson v. Zurn Industries, Inc.*, 131 F.R.D. 560, 562 (S.D. Ind. 1990) ("Facts concerning a defendant's financial status are ordinarily not discoverable."), *accord* (Dkt. 117 at 26). But here, where West has alleged a plausible claim that Wilco's actions were impermissibly motivated by self-dealing and profiteering,

Wilco's financial condition is an appropriate subject of discovery because it is the subject of a "party's claim." Fed. R. Civ. P. 26(b)(1).

Given the relevancy of Wilco's financial status, what boundaries then, if any, should cabin West's requests? That is, after all, what proportionality is about. Wilco offers no suggestions, opting instead to take an all-or-nothing approach, and objects to the requests in their entirety. Even in doing so, however, Wilco seems to admit that at least *some* of the requested financial information would be relevant. (*See, e.g.*, Dkt. 117 at 26 ("The *majority* of these post-repricing financial documents . . . do not specifically reference the CUL/CIUL2 product at all.") (emphasis added)). But, again, Wilco eschews the middle ground and suggests no limits or constraints on West's request. As such, Wilco's objections regarding the relevancy and overbreadth of the requests are **OVERRULED**.

Wilco also objects on the grounds that the requests seek documents "that do not specifically reference the CUL/CIUL2 product at all" or seek "embedded" information. (Dkt. 117 at 26; *see also id.* ("the annual statements . . . make no product specific references to CUL or CILU2"); *id.* at 27-28 (specifically referencing embedded value calculation and cash flow testing analyses)). For those documents that "may include" information about the policies at issue, Wilco states that the information "is embedded in a large block of different kinds of wholly unrelated products, and, therefore, has no bearing on the litigation." (*Id.* at 27 (referencing embedded value calculation, investment return and profitability analyses)). In advancing this argument, Wilco raises a proportionality objection, claiming the

"information would be of no benefit in deciding th[e] case" and "[a]ny marginal benefit of having this information would be outweighed [by] the cost associated with gathering and producing it." (*Id.* at 28). No specifics are offered as to such costs.

The Court **OVERRULES** these objections. "What constitutes relevant information is often a matter of judgment, and even irrelevant information within a document that contains relevant information may be highly useful to providing context for the relevant information." *Senior Lifestyle Corp. v. Key Benefit Adm'rs, Inc.*, No. 1:17-cv-2457-JMS-MJD, 2018 WL 9916128, at *2 (S.D. Ind. July 7, 2018) (internal quotation marks omitted). A document does not become immune to discovery simply because it intertwines or "embeds" relevant information with the non-relevant. Although West's task at unearthing the relevant portions may be more difficult in such circumstances, she is still entitled to the information. *See Bell v. Pension Comm. of ATH Holding Co., LLC*, 330 F.R.D. 517, 522 (S.D. Ind. 2018) ("It is not atypical for a document responsive to a discovery request to contain relevant and responsive information alongside non-responsive and irrelevant information. This fact does not impact the document[']s discoverability.").

Although the overall benefit of the information may be decreased due to the "embedded" nature of the information at issue, without any meaningful discussion of the burden imposed on Wilco by production, the Court cannot say that the requests are disproportional to the case. *See Avenatti v. Gree USA, Inc.*, No. 2:20-cv-00354-JPH-MJD, 2021 WL 1034392, at *4 (S.D. Ind. Mar. 17, 2021) ("[I]t is impossible for the Court to weigh the burden of production with the likely benefit of

the discovery—the heart of the proportionality analysis—when the Court has no idea what the burden would be.").

For these reasons, Plaintiff's Motion to Compel is **GRANTED** with respect to Plaintiff's First Request for Production Nos. 25, 43, 46, 56, 57, 59, and 61. Wilco **shall produce all documents responsive to those requests** within 28 days of this Order.

### 5.   ESI Protocol

In addition to requesting the Court to compel responses to various discovery requests, West also states that "Wilco should agree to an ESI protocol and produce relevant indexes outlining files contained in Wilco's voluminous ESI and hard-copy sources and used by Wilco's counsel for discovery purposes." (Dkt. 112 at 26).

An ESI Supplement to the Case Management Plan was issued on April 6, 2022. (Dkt. 94). To the extent West seeks to amend that protocol or requests the Court's assistance with enforcing its terms, she must file a separate motion. *See* S.D. Ind. L.R. 7-1(a). Moreover, any argument on this point must be sufficiently developed, which it was not here. This portion of her Motion to Compel is **DENIED**.

### C.   Regulatory Settlement: Request Nos. 1 and 2

The second category of documents sought by West pertains to the 2010 Regulatory Settlement Agreement ("RSA" or "2010 RSA"). (Dkt. 112 at 15-16, 27-28). Specifically, West asks the Court to order Wilco to respond to Request Nos. 1 and 2, which read as follows:

- ▪ **Request No. 1**: "The Regulatory Settlement Agreement described in WILCO_000001." (Dkt. 109-3 at 4)

23

- **Request No. 2**: "All proceeding transcripts (including exhibits), deposition transcripts (including exhibits), and expert reports in any regulatory proceeding relating to the Regulatory Settlement Agreement described in Wilco_000001." (Dkt. 109-3 at 4).

(Dkt. 112 at 15-16; Dkt. 117 at 8).

As way of background, the RSA is an agreement between Wilco and approximately 46 state regulators that provided for a $10 million settlement pool for LifeTrend policyholders and certain changes to Wilco's NGE redetermination process. (Dkt. 112 at 27). The LifeTrend policies were insurance policies distinct from the CUL and CIUL2 blocks. (Dkt. 117 at 28-29).

The 2010 RSA is referenced in a May 2011 actuarial report ("Actuarial Report") that pertains to the policies at issue in this litigation, (Dkt. 117 at 11). The Actuarial Report "explains and provides the basis for the CUL/CIUL2 COI rate change and the supporting documentation." (*Id.*; *see also* Dkt. 109-2 at 2).

West asserts that she will use "the RSA" and "related documents and communications"[13] to show that Wilco changed its NGE redetermination process shortly before the 2011 COI rate and expense charge increases at issue here. (Dkt. 112 at 28). West also asserts that the RSA and related documents contain information about Wilco's financial condition during the period leading up to the 2011 increases and thus will help her "demonstrate Wilco's motive" to engage in the shock-lapse strategy. (*Id.*). West does not elaborate further on how the requested documents will allow her to do so.

---

[13] West does not point to a specific Request or Interrogatory to which such "communications" would be responsive. With respect to this limited category of information, the Court has nothing to which to compel a response.

In response, Wilco contests the relevancy and proportionality of these requests, because the 2010 RSA dealt with "different policy provisions sold during a different period of time." (Dkt. 117 at 28-29). Wilco describes West's requests as "nothing more than an attempted smear campaign . . . and an improper attempt to ferret out alleged prior bad acts." (*Id.* at 29). Wilco also asserts that Plaintiff has a copy of the 2010 RSA. (*Id.*).

At the same time, however, Wilco admits that "the CUL/CIUL2 decision clearly took the [RSA] into account in that it expressly incorporated the COI change review process that the 46 State Insurance Departments asked Wilco to follow." (*Id.*). The fact that the 2011 increases were made according to the altered business practices and in compliance with the RSA, and that the Actuarial Report references the RSA, does not, Wilco maintains, automatically render the RSA relevant. (*Id.*).

The Court is not persuaded. Based on the record before the Court, the RSA is relevant to West's claim. Wilco itself asserts that the 2011 rate increases were made in compliance with the RSA's review process. (Dkt. 117 at 29; *see also* Dkt. 109-2 at 2). Surely, West is entitled to make that assessment for herself as it pertains directly to her claim that rates were increased in an improper and unreasonable manner. And such an assessment would not be possible with the copy of the 2010 RSA presently available to West. As she explains, "the portion of the settlement addressing Wilco's redetermination procedures (Exhibit H) was not included in the publicly available version of the Regulatory Settlement." (Dkt. 123 at 16 n.8). And,

as stated by Wilco, it is Exhibit H that detailed the "procedure . . . to be followed when evaluating future non-guaranteed element changes." (Dkt. 117 at 29).

For these reasons, Wilco's relevancy and proportionality objections to Request No. 1 are **OVERRULED**, and Wilco shall produce, **within 28 days of the date of this Order**, discovery responsive to West's First Request for Production No. 1.

West's second request presents differently. The Court is not convinced that West has made an adequate showing that the information sought in Request No. 2 is relevant and proportional to the needs of the case. On its face, her request encompasses a multi-year regulatory investigation spanning 46 states. While the Court agrees that the outcome of that process (*i.e.*, the RSA itself) is relevant to West's claim, the Court cannot draw the same conclusion with respect to all of the proceedings leading up to it. And West does not advance such an argument with any particularity.

In this respect, Wilco's relevancy and proportionality arguments are well taken. Accordingly, Wilco's objection to West's First Request for Production No. 2 is **SUSTAINED**.

### D.   Documents From Other Litigation

The third and final category of documents sought by West consists of documents produced and/or sought in other litigation. (Dkt. 112 at 16-18, 28-31). Specifically, West asks the Court to order Wilco to respond to Request Nos. 66, 67, and 70, which read as follows:

- **Request No. 66**: "All Documents and Communications produced in *In re Conseco Life Ins. Co. LifeTrend Insurance Sales and Marketing Litig.*, No.

1-cv-02124-SI (N.D. Ca.) and *Burnett v. Conseco Life Ins. Co.*, 18-cv-00200 (S.D. Ind.) Relating to Wilco's dividend payments to CNO Financial Group, Inc. (formerly known as Conseco, Inc.). *See* Complaint at ¶¶ 79-94." (Dkt.109-3 at 48).

- **Request No. 67**: "All Documents and Communications produced in *In re Conseco Life Ins. Co. LifeTrend Insurance Sales and Marketing Litig.*, No. 1-cv-02124-SI (N.D. Ca) and *Burnett v. Conseco Life Ins. Co.*, 18-cv-00200 (S.D. Ind.) Relating to Wilco's intercompany payments, including overhead expenses and service charges to CNO Services, LLC (formerly known as Conseco Services, LLC) and other CNO Financial Group, Inc. affiliates." (Dkt. 109-3 at 49).

- **Request No. 70**: "The Stock Purchase Agreement pursuant to which Wilton Re Holdings Limited acquired Conseco Life Insurance Company for $237 million, including closing documents relating to the acquisition." (Dkt. 109-5 at 4).

(Dkt. 112 at 17-18). The *LifeTrend* and *Burnett* litigation both related to the LifeTrend policy block. *See In re Conseco Life Insurance Co. LifeTrend Insurance Sales and Marketing Litigation*, 3:10-md-02124-SI (N.D. Cal.); *Burnett v. CNO Financial Gp., Inc., et al.*, No. 1:18-cv-200-JPH-DML, 2022 WL 896871, at *1 (S.D. Ind. Mar. 25, 2022).

West argues that these "highly focused categories of documents and communication . . . bear directly on [her] allegations of Wilco's profiteering and self-dealing." (Dkt. 112 at 28; *see also* Dkt. 123 at 18 ("Plaintiff is not seeking information regarding the LifeTrend policies, but instead is seeking documents that are central to the self-dealing and profiteering allegations at issue in this case.")). West proceeds to describe certain documents obtained and/or sought by the *Burnett* plaintiffs that she claims are responsive to her requests.[14] (Dkt. 112 at 28-31). Two

---

[14] To the extent West argues that these documents are responsive to other requests at issue, (*see, e.g.*, Dkt. 112 at 29 (alleging certain "documents" are responsive to the *Burnett*-related requests as well as Request No. 57)), the Court points the parties to its rulings on those specific discovery requests and trusts that Wilco will appropriately follow any directives to respond.

such documents are the 2014 Wilton Re Stock Purchase Agreement and the so-
called Milliman Appraisal. (*Id.* at 29). The former is the subject of Request No. 70
and is addressed in more detail below. As to the latter, West does not specify to
which Request the Milliman Appraisal is responsive, but simply argues that it
"undoubtedly contains . . . information for the CUL and CIUL2 policy block" because
Wilco "referenced" it when responding to Interrogatory No. 18 in the present case.
(*Id.* at 30 (citing Dkt. 109-4 at 23)).

In response, Wilco says these other-litigation requests lack any relevance or
proportionality because "[w]hat occurred in other litigation has no bearing on
whether the 2011 increase to COI rates and expenses was reasonable based on the
circumstances and information available when the increase was made." (Dkt. 117 at
30; *see also id.* at 31 (the other lawsuits "dealt with entirely different products,
entirely different policy provisions, different claims, and occurred during an earlier
time frame")). Wilco provides a long string cite for the proposition that "[c]ourts are
skeptical of relying heavily on documents from prior litigation such as the
documents Plaintiff seeks." (*Id.* at 30).

### 1.  **Request Nos. 66 and 67**

A discovery request is not doomed simply because it seeks information
produced in another lawsuit. *See, e.g. Exec. Mgmt. Servs., Inc. v. Fifth Third Bank*,
No. 1:13-cv-00582-WTL-MJD, 2014 WL 5529895 at *6 (S.D. Ind. Nov. 3, 2014)
("Because other lawsuits or filings could demonstrate [relevant] knowledge,
Plaintiffs' request does seek relevant information.") (internal citation omitted).

But, as Wilco correctly points out, any such request must be tailored to the needs of the case at hand. Other Seventh Circuit district courts have noted that, "as a general matter, simply asking an opponent to turn over everything it generated in other lawsuits is unacceptable[.]" *Eliason v. Superior Ref. Co., LLC*, No. 19-cv-829-WMC, 2020 WL 5440049, at *1 (W.D. Wis. Sept. 10, 2020). Instead, "you have to specify what it is you are looking for that is actually relevant to your case." *Id*. "Thus, the fact that a particular case found [particular documents] relevant and discoverable is the beginning and not the end of analysis." *Miller UK Ltd.*, 17 F. Supp. 3d at 722.

Here, although West has not attempted to pierce the corporate veil and join CNO Financial as a defendant, (*see* Dkt. 117 at 31), she has alleged that Wilco was motivated by self-dealing, an assertion the Court has found plausible and relevant to her implied covenant claims, (Dkt. 67 at 18-20). As such, information related to Wilco's financial condition is relevant to a "party's claim or defense." Fed. R. Civ. P. 26(b)(1).

However, and contrary to West's suggestion otherwise, "relevance alone does not translate into automatic discoverability under Federal Rule of Civil Procedure 26. An assessment of proportionality is essential." *Motorola Sols., Inc. v. Hytera Communications Corp.*, 365 F. Supp. 3d 916, 924 (N.D. Ill. 2019) (collecting cases). And, although Wilco's arguments regarding the burden of production are minimally developed, (Dkt. 117 at 32), and thus minimally persuasive, the parties and the court "have a collective responsibility to consider the proportionality of all discovery

and consider it in resolving discovery disputes." *Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 308 (S.D. Ind. 2016) (quoting Fed. R. Civ. P. 26(b)(1), Advisory Comm.'s Note to 2015 Amend.).

Here, the Court cannot simply ignore the proportionality concerns on the face of these Requests. West seeks an incredibly broad set of data: intercompany and dividend payments for more than a 10-year span. (Dkt. 117 at 32 (describing the payments as occurring between 2000 and 2010)). West maintains this information will help her show Wilco's "insolven[cy] due to rampant self-dealing and unjustified dividends paid to Wilco's prior corporate affiliates." (Dkt. 123 at 17) (citing Dkt. 67 at 18-19)). Wilco objects that these requests are overbroad and burdensome. The Court finds that a middle ground is appropriate here. *See* Fed. R. Civ. P. 1. West's request shall be narrowed to pertain to only those payments made in or after July 2008, *i.e.*, three years before the 2011 COI and expense rate increase.

For these reasons, Plaintiff's Motion to Compel is **GRANTED IN PART** with respect to Plaintiff's First Request for Production Nos. 66 and 67, **narrowed as follows**:

- **Request No. 66**: All Documents and Communications produced in *In re Conseco Life Ins. Co. LifeTrend Insurance Sales and Marketing Litig.*, No. 1-cv-02124-SI (N.D. Ca.) and *Burnett v. Conseco Life Ins. Co.*, 18-cv-00200 (S.D. Ind.) Relating to Wilco's dividend payments **made in or after July 2008** to CNO Financial Group, Inc. (formerly known as Conseco, Inc.). *See* Complaint at ¶¶ 79-94.
- **Request No. 67**: All Documents and Communications produced in *In re Conseco Life Ins. Co. LifeTrend Insurance Sales and Marketing Litig.*, No. 1-cv-02124-SI (N.D. Ca) and *Burnett v. Conseco Life Ins. Co.*, 18-cv-00200 (S.D. Ind.) Relating to Wilco's intercompany payments **made in or after July 2008**, including overhead expenses and service charges to CNO

Services, LLC (formerly known as Conseco Services, LLC) and other CNO Financial Group, Inc. affiliates.

Wilco **shall produce all documents responsive to these requests** within 28 days of this Order.

### 2.    Request No. 70

In Request No. 70, West seeks the 2014 Stock Purchase Agreement pursuant to which Wilton Re acquired Conseco Life Insurance Company as well as any "closing documents relating to the acquisition." (Dkt. 112 at 18). Her opening brief fails to explain the precise relevance of these documents, but rather simply asks the Court to order production of documents produced in *Burnett*. (*See id.* at 29). But "[s]ince what might make a species of documents relevant in one case does not necessarily make it relevant in all others, it is inappropriate for courts to be guided by past judicial evaluations of the relevance of seemingly similar evidence." *Miller UK Ltd.*, 17 F. Supp. 3d at 722 (internal quotation marks and citation omitted). Although West develops (to a certain extent) the relevancy argument in her reply brief, that is too late. *See Wonsey v. City of Chi.*, 940 F.3d 394, 398 (7th Cir. 2019) ("arguments raised for the first time in a reply brief are waived"); *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 360 (7th Cir. 1987) ("A reply brief is for replying.").

Accordingly, Wilco's objection to West's First Request for Production No. 70 is **SUSTAINED**.

### 3. __Milliman Appraisal__

Finally, West specifically asks the Court to compel production of the Milliman Appraisal. In doing so, however, she fails to explicitly articulate under which specific Request she is seeking the document. "The stated purpose of the Appraisal was to project *future* statutory earnings for certain life and annuity blocks of Conseco Life policies that were in force as of June 30, 2013." (Dkt. 117 at 33). The CUL and CIUL2 policies were in force at that time. (Dkt. 123 at 19). West contends that the Milliman Appraisal contains information concerning, "(1) Wilco's financial condition at various points of time; (2) historical information concerning COI deductions and premium calculations; (3) various assumptions regarding lapse rates, expense levels, interest rates, discount rates, and other factors . . . used when . . . valuing the policies; (4) and [] information regarding the value of CNO Services' post-acquisition services for Wilco" and thus is relevant for similar reasons to those articulated above for other documents. (Dkt. 112 at 30).

In response, Wilco returns to its common refrain. First, it revives its post-repricing relevancy argument. (Dkt. 117 at 32 ("The Milliman Appraisal . . . was dated December 31, 2013, roughly two and a half years after the July 2011 COI rate increase. Given the obvious passage of time, this type of information has absolutely no relevance on Conseco Life's (subsequently renamed as Wilco Life) justification in 2011 as to whether it could increase COI rates at that time.")). As discussed at length above, the Court has rejected this argument. Information possessed by Wilco

at the time of either the 2011 rate increases or the subsequent increased monthly charges is relevant to West's implied-covenant claim.

Next, Wilco argues that the 2013 Milliman Appraisal provides only "generalized financial information [that] should not be discoverable" and "is more akin to a general fishing expedition regarding the financial conditions of a defendant." (*Id.* at 33). The Milliman Appraisal dealt with "[c]alculations . . . performed on large blocks of policies," which were not broken down for "a particular block of business—such as the CUL and CIUL2 products—that were in force as of June 30, 2013." (*Id.*). As such, Wilco maintains, it is not relevant.

The Court is not persuaded by this argument. For reasons analogous to why West is entitled to the embedded value calculation and cash flow testing analyses referenced above, West is entitled to determine for herself what information about the pertinent policies can be extracted from the Appraisal. *See Cox v. Sherman Cap. LLC*, No. 1:12-cv-01654-TWP-MJD, 2016 WL 397607, at *1 (S.D. Ind. Feb. 2, 2016) ("even irrelevant information within a document that contains relevant information may be highly useful to providing context for the relevant information") (internal quotation marks omitted). Wilco has failed to meet its burden to demonstrate that the Appraisal "is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Estate of Daniels v. City of Indianapolis*, No. 1:20-cv-02280-JRS-MJD, 2021 WL 4844145, at *3 (S.D. Ind. Oct. 10, 2021).

Because all Wilco's objections to the production of the 2013 Milliman Appraisal are **OVERRULED**, Wilco shall produce said document if it is responsive to any of the discovery requests to which Wilco is obligated to respond (as a result of this Order or any other existing discovery obligation) within 28 days of this Order.

## V.   Conclusion

Accordingly, Plaintiff's Motion to Compel, Dkt. [108 (unredacted sealed version of motion)], [111 (redacted public version of motion)], is **GRANTED IN PART** and **DENIED IN PART**.

More specifically, Plaintiff's Motion is GRANTED as follows:

- Wilco shall produce all documents responsive to Request Nos. 51 and 60 (including an updated spreadsheet, if responsive) within 28 days of this Order.

- Wilco's objections to Request Nos. 1, 25, 43, 46, 56, 57, 59, and 61 are overruled. Wilco shall produce all documents responsive to Request Nos. 1, 25, 43, 46, 56, 57, 59, and 61 within 28 days of this Order.

- Wilco shall fully answer Interrogatory Nos. 18, 19, 20, 21, 22, 23, and 25 within 28 days of this Order.

- Wilco shall produce all documents responsive to Request Nos. 66 and 67, as narrowed herein, within 28 days of this Order.

- Wilco's objections to the production of the 2013 Milliman Appraisal are overruled. Wilco shall produce the 2013 Milliman Appraisal, if it is

responsive to any of the discovery requests to which Wilco is obligated

to respond, within 28 days of this Order.

The foregoing Ordered responses must be complete, unequivocal, and in strict

adherence to the Federal Rules of Civil Procedure.

Plaintiff's motion is DENIED as follows:

- To the extent that West seeks to amend the ESI protocol or requests

  the Court's assistance with enforcing its terms, that request is denied.

- Wilco's objections to Request Nos. 2 and 70 are sustained and no

  response is required at this time.

So ORDERED.

Date: 4/12/2023

M. Kendra Klump
United States Magistrate Judge
Southern District of Indiana

Distribution:
All ECF-registered counsel of record.